# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## WESTERN DIVISION

| | |
|---|---|
| YAMIN MOUSSELLI,<br><br>       Plaintiff,<br><br>v.<br><br>EQUIFAX INFORMATION SERVICES LLC,<br><br>       Defendant. | Case No. 5:25-cv-00071-BO-KS<br><br>**DEFENDANT EQUIFAX'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S ADDITIONAL MATERIAL FACTS** |

Defendant, Equifax Information Services LLC ("Equifax"), submits this response to Plaintiff's Additional Material Facts as follows:

**Additional Material Facts as to Which Plaintiff Contends There Is a Genuine Dispute**

**MATERIAL FACT NO. 72:**

Equifax never determined, in response to any of Mr. Mousselli's three disputes, whether the Hunter Warfield collection account was accurate or inaccurate. PSMF ¶ 44.

**RESPONSE:**

Disputed. Equifax's policies for handling consumer disputes define a reinvestigation as a "reasonable investigation into a dispute to determine whether the disputed information is inaccurate or incomplete." Additionally, it "is Equifax's intent to ensure data accuracy on a consumer's file. Equifax will suppress, or update any information that is found to be inaccurate, incomplete or unverifiable." See Second Declaration of Celestina Gobin ("Second Gobin Decl.") ¶¶ 12-13 & Exhibit M, at pp. 2, 3.

Undisputed, however, that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information

326259850v.1

that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

To the extent the Equifax 30(b)(6) deponent's testimony suggested otherwise, "Rule 30(b)(6) testimony also is not binding against [an] organization in the sense that the testimony can be corrected, explained and supplemented[.]" Schuyler Line Navigation Co., LLC v. Fluor AMEC II, LLC, No. 22-cv-4195, 2023 WL 6592143, at *7 n.3 (D.S.C. Oct. 10, 2023) (quoting 7 James Wm. Moore, et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)).

**MATERIAL FACT NO. 73:**

To Equifax, "the determination of accuracy or inaccuracy wasn't in play as far as the reinvestigation is concerned." PSMF ¶.

**RESPONSE:**

Disputed. Equifax's policies for handling consumer disputes define a reinvestigation as a "reasonable investigation into a dispute to determine whether the disputed information is inaccurate or incomplete." Additionally, it "is Equifax's intent to ensure data accuracy on a consumer's file. Equifax will suppress, or update any information that is found to be inaccurate, incomplete or unverifiable." See Second Declaration of Celestina Gobin ("Second Gobin Decl.") ¶¶ 12-13 & Exhibit M. Additionally, Equifax maintains an Independent Dispute Investigation

326259850v.1

Update Documents Standard, at times also referred to by the name of its predecessor, the Acceptable Documents Policy, which governs its determinations of when it will use consumer-submitted documents to make immediate updates to information in a consumer's credit file. See Equifax's Statement of Undisputed Material Fact No. 9 (Doc. 85 ¶ 9). When further investigation is required, and an ACDV sent to the data furnisher, once Equifax receives the ACDV response from the data furnisher, Equifax's policy is to review the ACDV response, then look to its own internal policies and procedures to see if they require a specific action, depending on the type of dispute (such as rejecting or overriding the data furnisher's ACDV response), and, if not, then to make no changes to the account if the data furnisher verifies that the account is being reported accurately or take any necessary action if the data furnisher advises Equifax to delete or otherwise update the account information. (Id. ¶ 15.)

Undisputed, however, that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an

326259850v.1

unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

To the extent the Equifax 30(b)(6) deponent's testimony suggested otherwise, "Rule 30(b)(6) testimony also is not binding against [an] organization in the sense that the testimony can be corrected, explained and supplemented[.]" Schuyler Line Navigation Co., LLC v. Fluor AMEC II, LLC, No. 22-cv-4195, 2023 WL 6592143, at *7 n.3 (D.S.C. Oct. 10, 2023) (quoting 7 James Wm. Moore, et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)).

**MATERIAL FACT NO. 74:**

Equifax's corporate representative testified that an accuracy determination "wasn't Equifax's call to make." PSMF ¶ 49.

**RESPONSE:**

Disputed as incomplete and misleading. Equifax's policies for handling consumer disputes define a reinvestigation as a "reasonable investigation into a dispute to determine whether the disputed information is inaccurate or incomplete." Additionally, it "is Equifax's intent to ensure data accuracy on a consumer's file. Equifax will suppress, or update any information that is found to be inaccurate, incomplete or unverifiable." See Second Declaration of Celestina Gobin ("Second Gobin Decl.") ¶¶ 12-13 & Exhibit M. Additionally, Equifax maintains an Independent Dispute Investigation Update Documents Standard, at times also referred to by the name of its predecessor, the Acceptable Documents Policy, which governs its determinations of when it will use consumer-submitted documents to make immediate updates to information in a consumer's credit file. See Equifax's Statement of Undisputed Material Fact No. 9 (Doc. 85 ¶ 9). When further investigation is required, and an ACDV sent to the data furnisher, once Equifax receives the ACDV response from the data furnisher, Equifax's policy is to review the ACDV response, then look to its own internal policies and procedures to see if they require a specific action, depending on the type of

326259850v.1

dispute (such as rejecting or overriding the data furnisher's ACDV response), and, if not, then to make no changes to the account if the data furnisher verifies that the account is being reported accurately or take any necessary action if the data furnisher advises Equifax to delete or otherwise update the account information. (Id. ¶ 15.)

Undisputed, however, that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

To the extent the Equifax 30(b)(6) deponent's testimony suggested otherwise, "Rule 30(b)(6) testimony also is not binding against [an] organization in the sense that the testimony can be corrected, explained and supplemented[.]" Schuyler Line Navigation Co., LLC v. Fluor AMEC II, LLC, No. 22-cv-4195, 2023 WL 6592143, at *7 n.3 (D.S.C. Oct. 10, 2023) (quoting 7 James Wm. Moore, et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)).

326259850v.1

**MATERIAL FACT NO. 75:**

When asked whether Equifax believes an investigation requires a determination of whether the disputed information is inaccurate, Equifax answered no. PSMF ¶ 43.

**RESPONSE:**

Disputed as incomplete and misleading. Equifax's policies for handling consumer disputes define a reinvestigation as a "reasonable investigation into a dispute to determine whether the disputed information is inaccurate or incomplete." Additionally, it "is Equifax's intent to ensure data accuracy on a consumer's file. Equifax will suppress, or update any information that is found to be inaccurate, incomplete or unverifiable." See Second Declaration of Celestina Gobin ("Second Gobin Decl.") ¶¶ 12-13 & Exhibit M, at pp. 2, 3. Additionally, Equifax maintains an Independent Dispute Investigation Update Documents Standard, at times also referred to by the name of its predecessor, the Acceptable Documents Policy, which governs its determinations of when it will use consumer-submitted documents to make immediate updates to information in a consumer's credit file. See Equifax's Statement of Undisputed Material Fact No. 9 (Doc. 85 ¶ 9). When further investigation is required, and an ACDV sent to the data furnisher, once Equifax receives the ACDV response from the data furnisher, Equifax's policy is to review the ACDV response, then look to its own internal policies and procedures to see if they require a specific action, depending on the type of dispute (such as rejecting or overriding the data furnisher's ACDV response), and, if not, then to make no changes to the account if the data furnisher verifies that the account is being reported accurately or take any necessary action if the data furnisher advises Equifax to delete or otherwise update the account information. (Id. ¶ 15.)

Undisputed, however, that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans

326259850v.1

Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

To the extent the Equifax 30(b)(6) deponent's testimony suggested otherwise, "Rule 30(b)(6) testimony also is not binding against [an] organization in the sense that the testimony can be corrected, explained and supplemented[.]" Schuyler Line Navigation Co., LLC v. Fluor AMEC II, LLC, No. 22-cv-4195, 2023 WL 6592143, at *7 n.3 (D.S.C. Oct. 10, 2023) (quoting 7 James Wm. Moore, et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)).

**MATERIAL FACT NO. 76:**

Since Mr. Mousselli's first dispute, Equifax's reinvestigation process has never included determining whether disputed information is inaccurate. PSMF ¶ 56.

**RESPONSE:**

Disputed. Equifax's policies for handling consumer disputes define a reinvestigation as a "reasonable investigation into a dispute to determine whether the disputed information is inaccurate or incomplete." Additionally, it "is Equifax's intent to ensure data accuracy on a consumer's file. Equifax will suppress, or update any information that is found to be inaccurate, incomplete or unverifiable." See Second Declaration of Celestina Gobin ("Second Gobin Decl.")

326259850v.1

¶¶ 12-13 & Exhibit M. Additionally, Equifax maintains an Independent Dispute Investigation Update Documents Standard, at times also referred to by the name of its predecessor, the Acceptable Documents Policy, which governs its determinations of when it will use consumer-submitted documents to make immediate updates to information in a consumer's credit file. See Equifax's Statement of Undisputed Material Fact No. 9 (Doc. 85 ¶ 9). When further investigation is required, and an ACDV sent to the data furnisher, once Equifax receives the ACDV response from the data furnisher, Equifax's policy is to review the ACDV response, then look to its own internal policies and procedures to see if they require a specific action, depending on the type of dispute (such as rejecting or overriding the data furnisher's ACDV response), and, if not, then to make no changes to the account if the data furnisher verifies that the account is being reported accurately or take any necessary action if the data furnisher advises Equifax to delete or otherwise update the account information. (Id. ¶ 15.)

Undisputed, however, that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an

326259850v.1

unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

To the extent the Equifax 30(b)(6) deponent's testimony suggested otherwise, "Rule 30(b)(6) testimony also is not binding against [an] organization in the sense that the testimony can be corrected, explained and supplemented[.]" Schuyler Line Navigation Co., LLC v. Fluor AMEC II, LLC, No. 22-cv-4195, 2023 WL 6592143, at *7 n.3 (D.S.C. Oct. 10, 2023) (quoting 7 James Wm. Moore, et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)).

**MATERIAL FACT NO. 77:**

Equifax never determined whether Mr. Mousselli owed Hunter Warfield any money. PSMF ¶ 12.

**RESPONSE:**

Disputed. The question asked by the questioning attorney which elicited the deposition testimony cited in support of Plaintiff's SMF No. 12 was properly the subject of a form objection that appears at the page and lines cited by Plaintiff's SMF No. 12. Undisputed that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection

326259850v.1

was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

**MATERIAL FACT NO. 78:**

Equifax never determined whether Mr. Mousselli owed any money to Metro University City. PSMF ¶ 13.

**RESPONSE:**

Undisputed that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

**MATERIAL FACT NO. 79:**

Equifax never determined whether Mr. Mousselli owed money to anyone. PSMF ¶ 14.

**RESPONSE:**

Undisputed that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

**MATERIAL FACT NO. 80:**

Equifax cannot identify where the reported balance of approximately $304–$315 originated. PSMF ¶ 15.

**RESPONSE:**

Undisputed that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less

a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50). Disputed to the extent that the Fact purports to claim that Equifax has no information in this litigation regarding the source of the balance. Indeed, Plaintiff's own testimony establishes the source of the balance. See Y. Mousselli Depo. 221:9-222:25 & Exh. L to deposition (Doc. 87-2, at p. 332); see also id. 123:15-126:21.

**MATERIAL FACT NO. 81:**

Equifax has no information as to how the balance came to be. PSMF ¶ 16.

**RESPONSE:**

Undisputed that it is not the obligation of a consumer reporting agency to determine the legal liability for debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt."), and Equifax did not make such determination of legal liability. Disputed otherwise, to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield

verified that the collection was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50). Disputed to the extent that the Fact purports to claim that Equifax has no information in this litigation regarding the source of the balance. Indeed, Plaintiff's own testimony establishes the source of the balance. See Y. Mousselli Depo. 221:9-222:25 & Exh. L to deposition (Doc. 87-2, at p. 332); see also id. 123:15-126:21.

**MATERIAL FACT NO. 82:**

Equifax itself did not verify the balance or amount past due. PSMF ¶ 17.

**RESPONSE:**

Disputed. The testimony referenced by Plaintiff's SMF No. 17 refers to the content of a document, an ACDV response from Hunter Warfield. Disputed to the extent the Fact purports to claim that Equifax did not make a factual determination, on the basis that Equifax contacted Hunter Warfield on three separate occasions via the industry standard ACDV process, and, each time, Hunter Warfield verified that the collection was for Plaintiff and that the account should report as an unpaid collection in the amount of approximately $300.00 on behalf of Metro University City. See Equifax's Statements of Undisputed Material Facts Nos. 30, 41, 50 (Doc. 85 ¶¶ 30, 41, 50).

**MATERIAL FACT NO. 83:**

The reported balance changed across the three reinvestigations — from $308 to $312 or $313 to $315 — and Equifax cannot explain those changes. PSMF ¶¶ 25, 31.

**RESPONSE:**

Undisputed that the balanced increased. Disputed otherwise. Indeed, Plaintiff's own testimony establishes the source of the balance and explains the increases. See Y. Mousselli Depo. 221:9-222:25 & Exh. L to deposition (Doc. 87-2, at p. 332) ("Because of interest at the rate of

326259850v.1

10.00%, the amount due on the day you pay may be greater."); see also id. 123:15-126:21. Further, these slight increases in the balance on a collection account are not inconsistent with accuracy or industry standards. Credit reporting is governed by Consumer Data Industry Association's Credit Reporting Resource Guide ("CRRG"), which contains extensive criteria to ensure the accuracy and integrity of credit reporting data submitted by data furnishers. (First Goblin Decl. ¶ 58.) (Doc. 84-1 ¶ 58.) Among other things, the CRRG's general reporting requirements for third party collection agencies require that collection agencies "[r]eport the complete name, address, social security number and date of birth for the legally liable consumer[]" and also specify the reported current balance and amount past due, which "may include fees and interest, depending on state and federal laws." (*Id*. ¶ 59 & Exhibit H thereto, at pp. 1, 6 (excerpts from 2022 CRRG General Reporting Requirements for third party collection agencies)).

**MATERIAL FACT NO. 84:**

Equifax agent Andres Hernandez told Mr. Mousselli during the second dispute that he did not have access to the documents Mr. Mousselli had submitted with his first written dispute. PSMF ¶ 21.

**RESPONSE:**

Disputed as irrelevant. This purported Material Fact is cited nowhere in Plaintiff's Response in Opposition to Equifax's Motion for Summary judgment.

**MATERIAL FACT NO. 85:**

Hernandez also told Mr. Mousselli that, depending on what Hunter Warfield reports, Equifax's system "automatically believes Hunter Warfield" over Mr. Mousselli and does not verify the accuracy of Hunter Warfield's statements. PSMF ¶ 21.

**RESPONSE:**

Disputed. The Equifax phone operator's responses are not as clear cut as Plaintiff makes them out to be. Further, the quoted language is Plaintiff's statement during the telephone call, not the Equifax phone operator's statement. Indeed, the portion of the transcript referenced by

326259850v.1

Plaintiff's SMF No. 21 shows that Plaintiff asked whether Equifax "automatically believes Hunter Warfield over me and [does] not verify the accuracy of their statement about me[?]," to which the Equifax phone operator responded that "it depends on what kind of information Hunter Warfield report[s] [about] you." Plaintiff then noted his dispute that "that has nothing to do with the validity of the account, determining whether the account is valid or not." The Equifax phone operator responded that concern by stating that, in such cases, Equifax will remove the account "if this account doesn't belong to you" or if it is "a fraudulent account or something like that" or "if Hunter Warfield is no longer reporting this account." All of this is consistent with the fact that it is not the obligation of a consumer reporting agency to determine the legal validity of the debts reported by data furnishers; that responsibility lies with the data furnishers under the regulations promulgated by the regulating agency, see Denan v. Trans Union, 959 F.3d 290, 295 (7th Cir. 2020) ("'Accuracy' for furnishers, however, means information that 'correctly [r]eflects ... liability for the account.' 12 C.F.R. § 1022.41(a). Neither the FCRA nor its implementing regulations impose a comparable duty upon consumer reporting agencies, much less a duty to determine the legality of a disputed debt.").

## MATERIAL FACT NO. 86:

Equifax dispute agents are not permitted to call a data furnisher or original creditor directly, but Equifax could give its agents authority to make such calls if it chose to. PSMF ¶ 37.

## RESPONSE:

Disputed as irrelevant. This purported Material Fact is cited nowhere in Plaintiff's Response in Opposition to Equifax's Motion for Summary judgment.

## MATERIAL FACT NO. 87:

Equifax does not know whether the dispute agents processed Mr. Mousselli's disputes in accordance with Equifax's policies and procedures. It simply assumes they did. PSMF ¶ 42.

**RESPONSE:**

Disputed. When Equifax receives a dispute from a consumer, Equifax's process is to open a dispute case that tracks the progress of the reinvestigation in a system known as its Consumer Care Management System or "CCMS," at times also referred to by the acronym for its predecessor, "ACIS." See Equifax's Statement of Undisputed Material Fact No. 5 (Doc. 85 ¶ 5). The CCMS record reflects, among other things, when the dispute was received, how it was received, the steps taken in response to the dispute, and the date(s) any correspondence was sent to the consumer. (Id. ¶ 5). Equifax can review its CCMS records to ascertain whether an agent's conduct was consistent with Equifax's policies and procedures, and, the Equifax 30(b)(6) deponent testified at the cited reference that he "found nothing in the review to indicate that they did anything outside of what was expected." (D. Stephens Depo 45:7-10.)

**MATERIAL FACT NO. 88:**

Equifax does not know what investigative steps Hunter Warfield actually took in response to any ACDV. PSMF ¶ 51.

**RESPONSE:**

Disputed. Equifax knows that a data furnisher such as Hunter Warfield is required to view the ACDV and any associated images before providing a response. See Equifax's Statement of Undisputed Material Fact No. 14. (Doc. 85 ¶ 14.) Further, Equifax's Agreement with Hunter Warfield requires Hunter Warfield to "notify Equifax immediately upon learning that information supplied is inaccurate or misleading" and to "provide Equifax will any corrections or additional information necessary to make the information supplied complete and accurate[.]" (Id. ¶ 61.)

To the extent the Equifax 30(b)(6) deponent's testimony suggested otherwise, "Rule 30(b)(6) testimony also is not binding against [an] organization in the sense that the testimony can be corrected, explained and supplemented[.]" Schuyler Line Navigation Co., LLC v. Fluor AMEC

II, LLC, No. 22-cv-4195, 2023 WL 6592143, at *7 n.3 (D.S.C. Oct. 10, 2023) (quoting 7 James

Wm. Moore, et al., Moore's Federal Practice § 30.25[3] (3d ed. 2016)).

**MATERIAL FACT NO. 89:**

Equifax does not know whether Hunter Warfield's verification of the collection account included any determination as to whether the information was accurate or inaccurate. PSMF ¶ 52.

**RESPONSE:**

Disputed. Equifax knows that a data furnisher such as Hunter Warfield is required to view

the ACDV and any associated images before providing a response. See Equifax's Statement of

Undisputed Material Fact No. 14. (Doc. 85 ¶ 14.)  Further, Equifax's Agreement with Hunter

Warfield requires Hunter Warfield to "notify Equifax immediately upon learning that information

supplied is inaccurate or misleading" and to "provide Equifax will any corrections or additional

information necessary to make the information supplied complete and accurate[.]" (Id. ¶ 61.)

**MATERIAL FACT NO. 90:**

Equifax's belief that Hunter Warfield provides accurate information when responding to ACDVs is based solely on expectations set forth for data furnishers and "nothing else." PSMF ¶ 53.

**RESPONSE:**

Disputed. Equifax knows that a data furnisher such as Hunter Warfield is required to view

the ACDV and any associated images before providing a response. See Equifax's Statement of

Undisputed Material Fact No. 14. (Doc. 85 ¶ 14.)  Further, Equifax's Agreement with Hunter

Warfield requires Hunter Warfield to "notify Equifax immediately upon learning that information

supplied is inaccurate or misleading" and to "provide Equifax will any corrections or additional

information necessary to make the information supplied complete and accurate[.]" (Id. ¶ 61.)

Additionally, Equifax will accept information only from furnishers that Equifax has

determined to be reasonably reliable based on the furnisher's reputation, Equifax's prior

326259850v.1

experience with the furnisher, or both. (Id. ¶ 58.) Equifax requires data furnishers to go through an

onboarding process, which includes an investigation into the data furnisher. (Id. ¶ 59.)

**MATERIAL FACT NO. 91:**

No one at Equifax ever determined, during any of Mr. Mousselli's reinvestigations, that his dispute presented a "legal dispute" rather than a factual dispute. Equifax's dispute agents are not lawyers and are not expected to make that determination. PSMF ¶ 47.

**RESPONSE:**

Undisputed.

**MATERIAL FACT NO. 92:**

Equifax would process Mr. Mousselli's disputes the same way today as it did in 2022 and 2023. PSMF ¶ 39.

**RESPONSE:**

Disputed. The Hunter Warfield account was deleted from Plaintiff's credit file by the end

of June 2023. See Equifax's Statement of Undisputed Material Fact No. 57 (Doc. 85 ¶ 57).

**MATERIAL FACT NO. 93:**

During the third dispute call, Equifax agent Eying Beni told Mr. Mousselli that the account was invalid, did not belong to him, and had a balance of zero — representations directly contrary to the written dispute results Equifax issued to Mr. Mousselli the very next day, which stated "WE VERIFIED THAT THIS ITEM BELONGS TO YOU" and reflected a balance of $315. PSMF ¶¶ 29–31.

**RESPONSE:**

Disputed. The phone operator's responses are not as clear cut as Plaintiff makes them out

to be. Despite some initial confusion, the phone operator clearly let Plaintiff know that she had

initiated a reinvestigation of the Hunter Warfield account, and provided him with a confirmation

number. See Doc. 84-7, at 23:8—24:2 ("Okay. So as per your request I have raised a dispute

regarding this concern. So would you like to note it down the confirmation number? . . . So, you

will be receiving the result of an investigation in your mailing address, okay, regarding this dispute

that I've just raised within 30 days.").

326259850v.1

Dated: Charlotte, North Carolina
      June 5, 2026

Respectfully submitted,

SEYFARTH SHAW LLP


By: */s/ Vincent Smolczynski*
    Vincent Smolczynski, NC Bar No. 59715
    vsmolczynski@seyfarth.com
    SEYFARTH SHAW LLP
    300 S. Tryon Street, Suite 400
    Charlotte, North Carolina  28202
    Telephone: (704) 925-6060
    Facsimile: (704) 946-6083

*Counsel for Defendant*
*Equifax Information Services LLC*

326259850v.1

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on June 5, 2026, I served the foregoing DEFENDANT EQUIFAX'S OBJECTIONS AND RESPONSES TO PLAINTIFF'S ADDITIONAL MATERIAL FACTS with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.  .

*/s/ Vincent Smolczynski*
Vincent Smolczynski
*Counsel for Defendant*
*Equifax Information Services LLC*

326259850v.1